UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THANH (TONY) TRAN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>THE HERTZ CORPORATION,<br><br>　　　　　Defendant. | Case No. 24-cv-07022-RFL<br><br>**ORDER GRANTING PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 28 |

　　　　Thanh (Tony) Tran was terminated from his position as a Hertz rental car sales agent. Tran alleges seven causes of action arising out of his termination: racial discrimination and retaliation in violation of California's Fair Employment and Housing Act, Cal. Gov't Code § 12900 *et seq.*; wrongful termination in violation of public policy; intentional infliction of emotional distress; nonpayment or late payment of wages in violation of Cal. Lab. Code §§ 201, 203; and inaccurate wage statements in violation of Cal. Lab. Code § 226.  Hertz moves for summary judgment on all claims.  For the reasons described herein, Hertz's motion is **GRANTED IN PART** and **DENIED IN PART**.  This order assumes the reader's familiarity with the facts of the case, the applicable legal standards, and the parties' arguments.[1]

　　　　The following summarizes the events leading up to Tran's termination, viewing the evidence in the light most favorable to Tran.  Tran was a high-performing employee.  (Dkt. No. 31-1 at 9–10.)[2]  On June 10, 2024, Tran was helping two Japanese customers at the counter when one gave their phone to Tran to talk to their friend.  (*Id.* at 98.)  The friend asked for information

---

[1] Both parties have objected to the consideration of certain evidence.  The objections are denied as moot because none of the objected to material is relied upon or cited, and even if considered, would not alter the outcome either way.
[2] All citations to page numbers refer to ECF pagination.

1

about the customers' rental, but Tran told the friend that he couldn't disclose private information about the customers. (*Id.* at 99–100.) Tran then handed the phone back to the customer. (*Id.* at 100.) After seeing that, Assistant General Manager Brittney Thomas pulled Tran into the back office. (*Id.*) She berated Tran by saying she didn't like how he talked to the customer, raised her voice, and then told Tran it was grounds for termination. (*Id.* at 100–01.) Tran told Thomas that he was feeling stressed out and would be clocking out and going home. (*Id.* at 101.) Thomas responded by telling Tran that if he didn't go back to the counter, he would be fired. (*Id.*) When he did not do so, Thomas suspended him. (*Id.*; *see also id.* at 176.) Two days later, Tran emailed HR representative Brooke Miller alleging managers showed favoritism to female Filipino employees. (*Id.* at 180–84.) Miller investigated and partially substantiated the complaint by finding a "perception amongst employees" that female Filipino employees received special treatment. (*Id.* at 175–79.) Miller also investigated the June 10 incident. (Dkt. No. 28-5 at 27–44.) Miller reported her findings in both investigations to General Manager Jacqueline Dela Rosa. (Dkt. No. 28-5 ¶ 11.) Miller and Dela Rosa then decided to terminate Tran effective June 28. (Dkt. No. 31-1 at 20–21, 114.) Hertz's letter stated Tran's termination was for "insubordination or failure to carry out a direct order or reasonable instruction given by a management representative, including but not limited to, refusal to work on jobs assigned by Management." (*Id.* at 114.)

      *FEHA Race Discrimination Claim*. FEHA discrimination claims are generally analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000). Under this framework, the plaintiff must first establish a prima facie case of discrimination. *Id.* at 354–55. Once a plaintiff does so, the burden of production shifts to the employer to present a nondiscriminatory reason for the allegedly discriminatory conduct. *Id.* at 355–56. If an employer presents such a reason, the presumption of discrimination disappears, and the plaintiff must either demonstrate that the employer's stated reason was pretext for discrimination or offer other evidence of discrimination. *Id.* at 356. Summary judgment can be appropriate "where, given the strength of the employer's

2

showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive . . . is too weak to raise a rational inference that discrimination occurred." *Id.* at 362. An alternative to the *McDonnell Douglas* framework is a mixed-motives framework, where a plaintiff aims to show that even if the employer had non-discriminatory reasons for its actions, discrimination was still a substantial motivating factor. *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 241 (2013). The plaintiff's burden under a mixed-motives framework is substantially similar to a plaintiff's burden under the third step of the *McDonnell Douglas* framework. *Husman v. Toyota Motor Credit Corp.*, 12 Cal. App. 5th 1168, 1185–86 (2017) (under either framework, "the relevant inquiry devolves to a showing of some discriminatory animus").

        Tran has not raised a genuine dispute of material fact sufficient to show his race was a substantial motivating factor in his termination.[3] Assuming without deciding that Tran can present a prima facie case as to his termination, Hertz makes a sufficient showing that Tran's insubordination was a legitimate nondiscriminatory reason for his termination. Hertz's policies identify insubordination as a reason that can justify immediate discharge. (Dkt. No. 28-2 at 69–70.) Dela Rosa's testimony is not to the contrary, since though she did not initially list insubordination as an egregious situation requiring immediate termination, she was only asked for some examples of egregious situations. (Dkt. No. 31-1 at 17–19.) Moreover, she later agreed that insubordination was a zero-tolerance event and didn't recall any employee receiving a second chance after being insubordinate. (*Id.* at 34.) Tran concedes that he refused a direct order to return to the counter to work with the customers, due to what he describes as feeling stressed and anxious. (*Id.* at 101.) The burden therefore shifts back to Tran to provide evidence supporting a rational inference that race discrimination was the true cause of his termination. *See Guz*, 24 Cal. 4th at 361.

        The undisputed evidence is that Miller and Dela Rosa made the decision to terminate

---

[3] Tran has abandoned any theory of adverse action other than his termination, presumably because the evidence does not indicate that Tran himself was denied his desired shifts, time off, or other scheduling requests.

Tran. (Dkt. No. 31-1 at 20–21.) Tran does not present any evidence of discriminatory intent for Miller. Tran's evidence that Dela Rosa had discriminatory intent appears limited to (1) an incident where Tran reported homophobic comments to Dela Rosa, with those comments stopping a few weeks later; and (2) Dela Rosa speaking Tagalog to Tran, who stopped and apologized after Tran said he didn't speak Tagalog. (Dkt. No. 28-2 at 146–50.) Neither of those incidents support an inference of race discrimination. Tran attempts to impute other managers' potential favoritism of Filipino employees to Dela Rosa, but he does not provide any evidence that Dela Rosa condoned or participated in such favoritism. Although Tran mentions that Dela Rosa changed a Filipino coworker's shift to a more favorable one on two occasions, there is no evidence about the reasons for the shift changes or that Dela Rosa denied comparable shift change requests from non-Filipino employees. (Dkt. No. 31-1 at 181.) Additionally, Miller's investigation only appeared to substantiate a "perception" of favoritism, not that any managers had engaged in favoritism. (*Id.* at 178.) Also, importantly, the evidence from the investigation did not connect any such favoritism to Dela Rosa. (*See id.* at 178–97.) Nor does Tran identify any Filipino employee who was permitted to engage in insubordination in similar circumstances without being terminated. Indeed, to the contrary, Tran describes a Filipino employee who was terminated for insubordination based on "the same type of reasoning" as in Tran's case. (Dkt. No. 28-2 at 44–46.) In sum, even drawing all reasonable inferences in Tran's favor, he does not present sufficient evidence to create a genuine dispute that his termination was motivated by race discrimination. As such, summary judgment is **GRANTED** in favor of Hertz on this claim.

      ***FEHA Retaliation Claim.*** Retaliation claims under FEHA are also analyzed under the *McDonnell Douglas* framework. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). A plaintiff's prima facie case for retaliation is showing (1) protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and adverse action. *Id.*

      This claim presents a closer call than the race discrimination claim, but Tran does not show a genuine dispute of material fact regarding a causal link between his protected activity and termination. Both Miller and Dela Rosa were aware Tran complained of discrimination when

4

they decided to terminate Tran. (Dkt. No. 28-4 ¶ 7.) Moreover, the termination occurred only two weeks after Tran submitted his complaint. (*See id.* ¶¶ 6, 10.) Tran therefore established a prima facie case. *See McRae v. Dep't of Corr. & Rehab.*, 142 Cal. App. 4th 377, 388 (2006). But after an employer identifies a legitimate nondiscriminatory reason for the adverse action, the plaintiff must show more than knowledge and temporal proximity by establishing pretext or other evidence of retaliation. *Id.* Tran presents no additional evidence from which a factfinder could reasonably infer that his discharge for insubordination was a pretext for retaliation. To the contrary, the record discloses another employee who was terminated for insubordination in similar circumstances to Tran, without any indication that employee engaged in protected activity prior to termination. (Dkt. No. 28-2 at 44–45.) Nor does Tran identify any other basis for retaliation beyond Dela Rosa's knowledge of his complaint. Summary judgment is **GRANTED** in favor of Hertz on the FEHA retaliation claim.

*Wrongful Termination in Violation of Public Policy.* This claim is derivative of Tran's FEHA claims. Since those claims fail, Hertz is **GRANTED** summary judgment on this claim too.

*Intentional Infliction of Emotional Distress.* A claim for intentional infliction of emotional distress requires showing "outrageous conduct beyond the bounds of human decency." *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 80 (1996). While employment discrimination can sometimes rise to the level of extreme and outrageous conduct, a plaintiff must show something more than an adverse personnel action due to discrimination. *Id.* Tran has not shown any adverse action against him was taken with discriminatory intent, let alone any outrageous conduct. Tran's only relevant evidence, outside of asserting termination based on discrimination, is that Thomas "berated" and "dehumanized" him before suspending him. (Dkt. No. 31-1 at 101.) However, Tran's further explanation of "berated" was that Thomas' "voice was quicker and her demeanor was more accusatory rather than ask[ing] what's going on" and that she did that in front of other managers. (Dkt. No. 28-2 at 40.) Even drawing all reasonable inferences in Tran's favor, that is insufficient to create a genuine dispute of material fact that

5

Thomas engaged in the level of extreme and outrageous conduct necessary to transform a personnel action into a claim for intentional infliction of emotional distress.  *See Janken*, 46 Cal. App. 4th at 80.  Hertz is therefore **GRANTED** summary judgment on this claim.

    *Payment of Commission Wages.*  At the hearing, Tran conceded he was paid all commission he was entitled to.  However, he maintains his commission was paid late since it was not paid on the date of his termination.  The question is when Tran's commission wages became calculable and therefore "immediately" due under Cal. Lab. Code § 201.  *See Labriola v. Bank of Am., Nat. Ass'n*, No. 12-CV-79-CW, 2012 WL 1657191, at *4 (N.D. Cal. May 10, 2012).  Tran's assertion that his commission was calculable on his date of termination is contradicted by the undisputed evidence that, even though at Tran's termination an employee could have accessed the databases used to calculate commission, the data in those databases would not have been complete.  (*See* Dkt. No. 31-1 at 75–76.)  For instance, one formula component (the NPS) is calculated for the entire Hertz location based on customer survey responses for the entire month.  (*Id.* at 63, 75; Dkt. No. 28-11 ¶ 7; Dkt. No. 28-11 at 9, 12.)  Since the formula components (and in turn, his commission) could have changed between Tran's termination and the end of the month, his commission could not be calculated at his termination.

    Nevertheless, Tran has identified a genuine dispute of material fact regarding when the commission became calculable.  Hertz asserts the commission was not calculable until July 18, the day it was paid to Tran.  But Cameron Smith's testimony supports a reasonable inference that the commission was calculable after the first week of July.  (*See* Dkt. No. 31-1 at 74–75 (formula components would have been finalized "[s]ometime one week after the month of June completed").)  Moreover, although employees are given a further one "week period to review the preliminary calculation of commissions" (Dkt. No. 28-11 ¶ 7), this additional one-week review period does not appear to be a condition precedent to Tran's earning of commission, because the Incentive Compensation Plan does not mention this review period.  (Dkt. No. 28-11 at 8–15.)  Also, the evidence supports a reasonable inference that terminated employees were not expected to participate in the review process because they no longer have access to the pertinent data.

(*See* Dkt. No. 31-1 at 68–69, 72.)  In addition, even if the employee review process had to be completed before the commission could be calculable, the second work-week of July 2024 ended on July 12.  Hertz does not explain why the commission would not be calculable until July 18, which is six days later.  Summary judgment is therefore **GRANTED** as to the claim that Tran was not paid in full the commission wages that he was owed, but **DENIED** as to Tran's claim for untimely payment of those commission wages.  *See Labriola*, 2012 WL 1657191, at *4.

*Payment of Non-Commission Wages.*  Tran does not address the claim alleged in the complaint regarding wages earned between June 7 to 10, 2024, or present evidence in support of that theory, so it is forfeited.  Instead, Tran raises for the first time a $105 non-cash award that he asserts was paid approximately a month after his termination.  Even assuming this theory can be considered without having been pled, Hertz submitted undisputed evidence that Tran redeemed these gift card awards before his termination.  (Dkt. No. 32-2 ¶ 7.)  Though Tran identifies a July 25 wage statement listing the award, the undisputed evidence is that this statement reflects only that Hertz paid the taxes for the award at that time and shows no net payment to Tran.  (*Id.* ¶ 9, Ex. 2.)  Since there is no evidence from which a reasonable factfinder could find Hertz failed to timely pay non-commission wages, Hertz is **GRANTED** summary judgment on this claim.

*Failure to Provide Compliant Wage Statements.*  The undisputed record shows that Tran's commission was not listed on the July 3 wage statement he received for wages paid at termination on June 28, and that it was listed instead on his final July 18 wage statement, which documented the payment of the commission, its amount, and when those commissions were earned.  (*See* Dkt. No. 31-1 at 155–56, 158–59.)  At the hearing, Tran contended that the July 3 statement was defective because it should have included his commission, and that the July 18 statement incorrectly listed the pay period as July 5 to 11, 2025 (when the commissions became calculable) instead of the pay period leading up to June 28.  *See* Cal. Lab. Code § 226(a)(6). Both those alleged flaws are premised upon Tran's commission being calculable on the date of his termination on June 28.  However, as explained above, the commission calculation undisputedly relied upon information not yet available at the time of his termination, so his

7

commission was not yet calculable on June 28.  As a result, Tran has not shown a genuine dispute of material fact as to this claim, and Hertz is therefore **GRANTED** summary judgment on it.

*Conclusion.*  For the foregoing reasons, Hertz is **GRANTED** partial summary judgment.  Summary judgment is **GRANTED** as to Tran's FEHA claims, wrongful termination in violation of public policy claim, intentional infliction of emotional distress claim, claim for non-payment of the commission wages owed, unpaid non-commission wages claim, and failure to provide compliant wage statements claim.  Summary judgment is **DENIED** as to Tran's claim for untimely payment of commission wages.

**IT IS SO ORDERED.**

Dated: December 16, 2025

RITA F. LIN
United States District Judge